HAWTHORNE I. TUCKER and HELEN F. TUCKER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent; DELANO I. TUCKER, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Tucker v. Commissioner
Docket Nos. 2433-80, 2434-80.
United States Tax Court
T.C. Memo 1983-456; 1983 Tax Ct. Memo LEXIS 330; 46 T.C.M. (CCH) 928; T.C.M. (RIA) 83456; August 4, 1983. *330 Held: Petitioners Hawthorne and Helen Tucker are taxable on the net profits received from D & H Custom Homes during 1974, 1975 and 1976 in the amounts determined by respondent. Held further, a part of the underpayment of tax attributable to such unreported income for all 3 taxable years was due to fraud. John M. Peterson, for the petitioners. Richard F. Stein, for the respondent. IRWIN
MEMORANDUM FINDINGS OF FACT AND OPINION IRWIN, Judge: Respondent determined deficiencies in income tax and additions to tax for fraud in these consolidated cases as follows: Hawthorne I. and Helen F. Tcker -- Docket No. 2433-80
Section 6653(b) [1]
Year
Deficiency
Addition to Tax
1974
$2,116.84
$1,058.42
1975
3,961.79
1,980.90
1976
4,182.70
2,091.35
Delano I. Tucker -- Docket No. 2434-80
1974
$1,101.54
$ 550.77
1975
247.06
1,897.11
1976
3,794.83
1,897.42
After concessions by petitioners, [2] the issues remaining for our decision are: (1) whether petitioners Hawthorne and Helen Tucker and/or petitioner Delano Tucker understated taxable income for the taxable years 1974, 1975 and 1976 by failing to report *331 as income profits received from D & H Custom Homes; and (2) whether a part of the underpayment of income tax due from petitioners Hawthorne and Helen Tucker and/or petitioner Delano I. Tucker for each of the 1974, 1975 and 1976 taxable years was due to fraud. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The consolidated stipulations of fact and the exhibits attached thereto are incorporated herein by this reference. Hawthorne I. Tucker and Helen F. Tucker are husband and wife and resided together in Suffolk, Virginia, on February 21, 1980, the date their petition was filed in docket No. 2433-80. Hawthorne and Helen filed timely joint income tax returns for their taxable years 1974, 1975 and 1976 with the Memphis Service Center, Memphis, Tennessee. Mr. and Mrs. Tucker are the parents of Delano I. Tucker. Delano I. Tucker resided in Adelphi, Maryland, *332 on February 21, 1980, the date his petition was filed in docket No. 2434-80. Delano filed timely income tax returns for his taxable years 1974, 1975 and 1976 with the Memphis Service Center, Memphis, Tennessee. Delano filed amended tax returns for his 1974 and 1975 taxable years on February 22, 1977. Delano was born on March 27, 1949, and was an adult during the taxable years at issue. Hawthorne was born in 1915 in McKenney, Virginia. He earned a degree in agriculture education from Virginia State College in 1940, served in the Army during World War II and either taught school in McKenney or served as a school principal in Suffolk, Nansemond County, Virginia, continuously from 1945 to 1971. On August 1, 1963, Hawthorne became the principal of Mount Zion Elementary School in Suffolk and served in that capacity until July 1971. During the 8-year period of his employment with the Nansemond County School Board, Hawthorne contributed $4,737.58 to the Virginia Supplemental Retirement System. In July 1971, Hawthorne suffered a heart attack and on the advice of his physician ceased his employment as a school principal. Thereafter, Hawthorne applied for Virginia Supplemental Retirement *333 benefits. He was examined by a physician and was found to be disabled. In addition, he applied for and was granted Social Security disability benefits. Hawthorne received disability retirement benefits from the Virginia Supplemental Retirement System in the following total annual amounts: 1973
$3,448.75
1974
3,789.53
1975
3,996.24
1976
4,347.74
In addition, he qualified for and received social security disability benefits during the same years. Helen was born in McKenney, Virginia, in 1917. She earned a college degree in elementary education in 1964 and was employed as a school teacher by the Nansemond County School Board, Suffolk, Virginia, continously from 1965 to 1975. In 1976, Helen suffered the first of three strokes and retired from teaching on disability and received disability retirement benefits in the amount of $1,570.80 in that year. Delano was a 2nd Lieutenant in the United States Army, stationed at Fort Lee, Virginia, from January 1 until June, 1974. Commencing in July 1974, and continuing until February 1977, Delano was a graduate student at George Washington University in Washington, D.C. During the fall semester of 1974 (September - November), while a full-time student, *334 Delano also worked 20 hours per week as a fitness coordinator at the Town Center Management Health Club in Washington, D.C. During the spring semester of 1975 (January - June), Delano was employed by the District of Columbia as a substitute teacher. He worked an average of 30 hours per week. During the summer of 1975 (June - August), Delano was employed for 40 hours per week as a group conselor by the Maryland National Capital Park and Planning Commission in Silver Spring, Maryland. From September 1975 to June 1978, Delano was employed on a full-time basis by the Fairfax County School Board, Fairfax, Virginia, as a physical education teacher. Beginning in July 1974, Delano resided in Washington, D.C. From October 1975 until early 1977, he resided in the suburb of Alexandria, Virginia. By a Deed dated September 14, 1972, and recorded on October 6, 1972, in the Clerk's Office of the Circuit Court of Dinwiddie County, Virginia, Hawthorne and Helen transferred to Delano an undivided interest in approximately 8.178 acres of undeveloped land located in the town of McKenney, Virginia. On October 26, 1973, W. G. Chappel, a certified land surveyor, surveyed and platted the 8.178 acre *335 undeveloped tract of land at Hawthorne's request. The survey was made for the purpose of subdividing the 8.178 acre tract into 16 plots suitable for the construction of a single family residence on each. The subdivided land became known as Tucker's Subdivision. Hawthorne paid Mr. Chappel $1,275 for his services in preparing the survey and plat of the subdivision on November 26, 1973. The plat of Tucker's Subdivision was approved by the Dinwiddie County highway engineer, the health officers and the mayor of McKenney in 1974. Delano applied for a County of Dinwiddie Business License for the period June 18, 1974, through December 31, 1974. The Contractor's License was issued to Delano and Helen on June 18, 1974. An application for a permit for construction, repair or improvement of buildings and structures was filed with the Town of McKenney on June 25, 1974. The application was for permission to construct a house on Lot 2, Tucker's Subdivision. The application lists the owner's name as "D & H Custom Homes, H. F. Tucker or Delano I. Tucker." The Commonwealth of Virginia issued a state business license to Delano and Helen, a partnership, conducting the business of contractor for *336 the period June 18, 1974 through December 31, 1974. The application was applied for on June 18, 1974. Delano applied for a County of Dinwiddie Business License for the period January 1, 1975, through December 31, 1975. The Contractor's License was issued to Delano and Helen on January 1, 1975. The Commonwealth of Virginia issued a state business license to Delano and Helen, a partnership, conducting the business of contractor for the period of January 1, 1975, through December 31, 1975. The application was applied for on January 3, 1975. The town of McKenney issued License No. 484 to D & H Custom Homes, Delano or Helen Tucker, for the period July 1, 1975 through July 1, 1976. Permit for Construction No. 75-263 was issued by the County of Dinwiddie for the construction of a house on Lot 1, Tucker's Subdivision, on July 14, 1975. The permit lists Hawthorne, Helen, and Delano Tucker as the owners and contractors. The application was signed by Delano. Permit for Construction No. 75-276 was issued by the County of Dinwiddie on July 24, 1975, for the construction of a house in Tucker's Subdivision. The permit lists Hawthorne, Helen, and Delano Tucker as the owners and contractors. *337 The application was signed by Delano. Hawthorne and Delano opened a joint checking account (no. XX-XXXX05-06) on January 31, 1968, at the Bank of Suffolk. Hawthorne and Delano maintained a bank account at the Bank of McKennedy between January 25, 1973, and September 2, 1977. Hawthorne and Helen opened a checking account on December 14, 1973, at the Farmers Bank of Windsor. Hawthorne, Helen, and Delano opened savings account no. XXXX as trustees for Travis D. Tucker, Delano's son, on October 5, 1973, at the Farmers Bank of Windsor. On July 1, 1974, a checking account at the Bank of McKennedy was opened in the name of D & H Custom Homes. Delano and Helen had signature authority on that account. On April 4, 1975, Hawthorne opened individual share account no. XXXX at the Nansemond Credit Union in Suffolk, Virginia. Hawthorne and Helen opened a joint savings account (no. XX-XXXX36-20) at the Bank of Suffolk on April 13, 1975. On April 14, 1976, Hawthorne, Helen, and Delano opened a joint account no. XXX-XX538-8 at the Petersburg Mutual Savings and Loan Association. On October 5, 1973, Hawthorne received loan no. 2517, in the amount of $3,630, from the Bank of McKenney. A balance *338 was outstanding on that loan from October 5, 1973 until April 15, 1976, a period of approximately 30 months. Payments in the amount of $300 were made in approximately 3 month intervals from February 5, 1974 until February 4, 1976. A final payment of $930 was made on April 15, 1976. On March 29, 1974, Hawthorne and Helen applied for and received loan no. 2855, in the amount of $4,000, from the Bank of McKenney.The proceeds of that loan were deposited in the joint bank account of Hawthorne and Delano at the Bank of McKenney. Hawthorne and Helen had an outstanding balance on loan no. 2855 from March 29, 1974, until September 9, 1975, a period of approximately 17-1/2 months. The loan was repaid in six intermittent installments ranging in amount from $500 to $1,000.
On July 10, 1974, Hawthorne and Helen applied for and received loan no. 3099, in the amount of $7,000, from the Bank of McKenney. The proceeds of loan no. 3099 were deposited in the D & H Custom Homes checking account at the Bank of McKenney. On August 16, 1974, Hawthorne and Helen applied for and received loan no. 3191 from the Bank of McKenney in the amount of $14,000. The sum of $6,944 from the proceeds of loan no. *339 3191 was deposited in the D & H Custom Homes checking account at the Bank of McKenney. The sum of $7,000 from the proceeds of loan no. 3191 was used to pay off Mr. and Mrs. Hawthorne's personal loan no. 3099 at the Bank of McKenney. On November 18, 1974, Hawthorne and Helen applied for and received loan no. 3377, in the amount of $6,000, from the Bank of McKenney. The proceeds from loan no. 3377 were deposited in the D & H Custom Homes checking account at the Bank of McKenney. On January 27, 1975, Hawthorne applied for and received loan no. 3559, in the amount of $4,000, from the Bank of McKenney. The sum of $1,979.12 from the proceeds of loan no. 3559 was deposited to the D & H Custom Homes checking account at the Bank of McKenney. The sum of $2,000 from the proceeds of loan no. 3559 was applied against the balance due on Hawthorne and Helen's personal loan no. 3377, reducing the outstanding balance from $6,000 to $4,000. On July 22, 1975, Hawthorne and Helen applied for and received loan no. 4030, in the amount of $8,000, from the Bank of McKenney. The sum of $7,896.92 from the proceeds of loan no. 4030 was deposited to the D & H Custom Homes checking account at the Bank *340 of McKenney. On August 18, 1975, Hawthorne applied for and received loan no. 4087, in the amount of $14,000 from the Bank of McKenney. The sum of $5,952 from the proceeds of Hawthorne's personal loan no. 4087 was deposited to the D & H Custom Homes checking account at the Bank of McKenney. The sum of $8,000 from the proceeds of Hawthorne's personal loan no. 4087 was applied against the balance due on Hawthorne and Helen's loan no. 4030, reducing the outstanding balance on that loan to zero. On September 8, 1975, Howthorne and Helen applied for and received loan no. 4133, in the amount of $6,000, from the Bank of McKenney. The proceeds from loan no. 4133 were deposited to the D & H Custom Homes checking account at the Bank of McKenney. On October 17, 1975, Hawthorne applied for a $2,000 loan from the Nansemond Credit Union which was approved on October 20, 1975.Pursuant to Hawthorne's directions, the Nansemond Credit Union made the $2,000 check for the proceeds of the loan payable to D & H Custom Homes. Of the $2,000 proceeds from the Nansemond Credit Union loan, $1,500 was deposited in the D & H Custom Homes checking account in the Bank of McKenney. On June 1, 1976, Delano *341 applied for and received loan no. 4835, in the amount of $4,390, from the Bank of McKenney.The purpose of this loan was to finance the purchase of Delano's personal 1976 Datsun automobile. The proceeds from Delano's $4,390 loan were deposited to the joint account of Hawthorne and Delano at the Bank of McKenney on June 1, 1976.From June 1, 1976, through December 8, 1977, Delano made the following principal payments on his personal loan no. 4835: August 26, 1976
$ 420.00
November 29, 1976
300.60
March 2, 1977
266.62
June 3, 1977
291.96
September 1, 1977
300.00
December 8, 1977
275.05
$1,854.23
On December 11, 1976, Hawthorne applied for a $1,400 loan from the Nansemond Credit Union. The stated purpose of the loan was to provide funds for his son's moving expenses. The loan was approved on December 13, 1976. The proceeds of the $1,400 loan were deposited to Delano's bank account at the First National Bank of Falls Church. During 1974, two houses were constructed and sold in Tucker's Subdivision. [3] During 1975, two houses were constructed and sold and during 1976, one house was constructed and sold. The proceeds received from the sales of the five houses in Tucker's Subdivision were deposited *342 to either the D & H Custom Homes checking account at the Bank of McKenney, or the personal joint checking account of Hawthorne and Helen at the Farmers Bank of Windsor. On October 15, 1974, lot no. 2 and the house thereon in Tucker's Subdivision was sold to James A. and Paulette K. Moore for $22,500. By letter dated October 15, 1974, James F. Andrews, the attorney who handled the closing on the Moore house, mailed a check in the amount of $22,472.49, representing the net proceeds from the sale, to Hawthorne and Helen.The entire proceeds from the sale of the Moore house were deposited in the joint checking account that Hawthorne and Helen maintained at the Farmers Bank of Windsor on October 17, 1974. Prior to the deposit of the proceeds from the Moore sale, the balance in Hawthorne and *343 Helen's account at the Farmers Bank of Windsor was $5,320.81. Hawthorne used some of the proceeds from the Moore sale to pay the Bank of McKenney $8,000 on the $14,000 loan no. 3191 he and Helen had received from the bank. Hawthorne used $5,000 of the proceeds from the Moore sale to pay back a loan he had received from his nephew, "Piggy" Washington, the owner of Wash's Inn. Hawthorne used $3,070 of the proceeds from the Moore sale to pay Leroy Gathers the money he borrowed from him. Between October 17 and October 21, 1974, a check in the amount of $2,500 was withdrawn from Hawthorne's joint account at the Farmers Bank of Windsor and deposited in the D & H Custom Home checking account at the Bank of McKenney. Hawthorne withdrew $5,033.38 from his joint account at the Farmers Bank of Windsor on October 24, 1974, to pay C.P Parham for land costs incurred in his construction of the homes in Tucker's Subdivision. On December 9, 1974, lot no. 3 and the house thereon in Tucker's Subdivision was sold to Freddie C. and Lady G. Roberts for $22,500. By letter dated December 9, 1974, James F. Andrews, the attorney who handled the closing on the Roberts house, mailed a check in the amount *344 of $22,473.50, representing the net proceeds from the sale, to Hawthorne and Helen.On December 10, 1974, $20,100 of the proceeds from the Roberts sale was deposited in the D & H Custom Homes checking account. Prior to that deposit, the balance in the D & H Custom Homes checking account was $3,966.89. On December 10, 1974, $10,100 was withdrawn from the D & H account. Of that amount, $6,000 was used to pay the Bank of McKenney the balance due on Hawthorne and Helen's personal loan no. 3191. In addition, $4,000 was used to reduced the outstanding balance on Hawthorne and Helen's personal loan no. 3377 from $6,000 to $2,000. On December 10, 1974, $5,000 of the $20,100 in proceeds from the Roberts sale, deposited in the D & H Custom Homes account, was transferred to Hawthorne and Helen's joint checking account at the Farmers Bank of Windsor. On February 28, 1975, lot no. 16 and the house thereon in Tucker's Subdivision was sold to James E. and Clarence S. Goodwyn for $22,800. By letter dated February 28, 1975, James F. Andrews, the attorney who handled the closing on the Goodwyn house, mailed a check in the amount of $22,755, representing the net proceeds from the sale, to Hawthorne *345 and Helen. On March 3, 1975, $10,000 of the proceeds from the Goodwyn sale was deposited in the D & H Custom Homes account. Prior to that deposit, the balance in the account was $1,696.74. On March 3, 1975, $3,932 was withdrawn from the D & H Custom Homes account. Of that amount, $3,900 was used to reduce the outstanding balance on Hawthorne's personal loan no. 3559 from $4,000 to $100. Between April 3 and April 7, 1975, $5,000 of the proceeds from the Goodwyn sale, deposited in the D & H Custom Homes account, was transferred to Hawthorne and Helen's joint savings account at the Bank of Suffolk. On March 3, 1975, $12,000 of the proceeds from the Goodwyn sale was deposited in Hawthorne and Helen's joint account at the Farmers Bank of Windsor. Prior to that deposit, the balance in their account was $307.06. On December 18, 1975, lot no. 1 and the house thereon in Tucker's Subdivision was sold to Lloyd V. and Crystal W. Mitchell for $23,000. On December 18, 1975, Herbert T. Williams, III, the attorney who handled the closing on the Mitchell house, issued two checks to Hawthorne. A $43 check, representing the seller's costs for the preparation of the deed and the grantor's tax, *346 was made payable by Hawthorne's endorsement to H. T. Williams, III. The second check, in the amount of $22,957, representing the net proceeds of the Mitchell sale, was endorsed in blank by Hawthorne. On December 19, 1975, $22,457 of the net proceeds from the sale of the Mitchell house was deposited in the D & H Custom Homes checking account. Prior to that deposit, the balance in the account was $2,112.84. On December 19, 1975, $17,511.11 of the net proceeds of the Mitchell sale was used to reduce the outstanding balances on loan no. 4087 and loan no. 4133 at the Bank of McKenney. Howthorne's personal $14,000 loan no. 4087 was paid in its entirety (including late charges). In addition, Hawthorne and Helen's personal loan no. 4133 was reduced from $6,000 to $3,000. Between December 22 and December 23, 1975, $2,000 of the proceeds from the Mitchell sale was transferred from the D & H account to Hawthorne and Helen's personal joint checking account at the Farmers Bank of Windsor. Between December 20 and December 29, 1975, $2,042.67 of the proceeds from the Mitchell sale was transferred from the D & H account to the Nansemond Credit Union to pay, in its entirety, Hawthorne's personal *347 loan in the amount of $2,000, plus interest, made on October 17, 1975. On April 8, 1976, lot no. 13 and the house thereon in Tucker's Subdivision was sold to Frank and Geraldine H. Coleman for $22,500. Herbert T. Williams, III, was the attorney who handled the closing on the Coleman house. On April 8, 1976, $22,386.09, representing the net proceeds from the Coleman sale, was deposited in the D & H Custom Homes account. Prior to that deposit, the balance in the D & H account was $2,060.81. Between April 8 and April 9, 1976, $3,023.33 of the proceeds from the Coleman sale was withdrawn from the D & H account and was used to reduce the outstanding balance on Hawthorne and Helen's personal loan no. 4133 at the Bank of McKenney. Between April 9 and 12, 1976, $4,300 of the proceeds from the Coleman sale was withdrawn from the D & H account and deposited in the joint checking account Hawthorne and Delano maintained at the Bank of Suffolk.
Between April 14 and 16, 1976, $5,000 of the proceeds from the Coleman sale was withdrawn from the D & H account and deposited in two accounts at the Farmers Bank of Windsor. On April 14, Hawthorne and Helen's personal checking account was credited *348 with a $3,000 deposit. On the same day, the trustee savings account for Travis D. Tucker was credited with a $2,000 deposit. Also, between April 4 and 16, 1976, $10,000 of the proceeds from the Coleman sale was withdrawn from the D & H account and deposited, as the initial deposit, in a savings account in the names of H. I. Tucker, Helen Tucker, or D. I. Tucker, at the Petersburg Mutual Savings & Loan. On April 19, 1976, $1,000 was withdrawn from the D & H account and paid to Delano for plumbing and heating work he had performed. Ray Hicks dug the foundation, laid the block for the foundation, and framed the first house built in Tucker's Subdivision. He also dug the foundation and laid the block for the foundation for the second house. Ray Hicks was hired by Hawthorne. During the time he worked at the D & H project, all his negotiations and business dealings were with Hawthorne.Ray Hicks was paid for his work by Hawthorne with two checks. One check was dated July 19, 1974, in the amount of $1,420, and was drawn on the D & H Custom Homes checking account. The other check was dated July 12, 1974, in the amount of $1,000, and was drawn on Hawthorne and Helen's personal checking account *349 at the Farmers Bank of Windsor.
Daniel Hopson worked as a carpenter on the houses in Tucker's Subdivision. He installed the siding on the first house in the subdivision. He installed the floor joists, the subfloor, all of the framing, the siding, and roof on the other four houses in the subdivision. He dug the foundation on one house. Daniel Hopson was paid on an hourly basis once a week. He was always given a check by Hawthorne. Delano never paid him. During 1974, Daniel Hopson was issued a total of 17 checks; one in July, five in August, three in September, one in October, five in November, and two in December. Sixteen of those checks were drawn on the D & H Custom Homes account, and one was drawn on Hawthorne and Helen's personal account at the Farmers Bank. Daniel Hopson was paid a total of $1,993.50 during 1974. During 1975, Daniel Hopson was issued a total of 20 checks; three in January, three in February, two in July, four in August, three in September, four in October, and one in November. All of the checks were drawn on the D & H account. Daniel Hopson was paid a total of $2,392.70 during 1975. Kermit Powell worked as a painter on the houses in Tucker's Subdivision. *350 Kermit Powell was paid on an hourly basis once a week. He was always given a check by Hawthorne. Delano never paid him. During the construction period in 1974, Kermit Powell was issued a total of 12 checks; three in August, four in September, two in October, and three in November. Eleven of those checks were drawn on the D & H Custom Homes account, and one was drawn on Hawthorne and Helen's personal account at the Farmers Bank. In addition, Powell was issued one check in March 1974 and one in May 1974. Both of those checks were drawn on Hawthorne and Helen's personal account at the Farmers Bank of Windsor. Kermit Powell was paid a total of $1,024.25 during 1974. During 1975, Kermit Powell was issued a total of 16 checks; two in January, four in February, four in September, five in October, and one in November. All of the checks were drawn on the D & H account. Kermit Powell was paid a total of $1,469.76 in 1975. Between February 27, 1975, and July 24, 1975, only one check was drawn on the D & H Custom Homes account for a labor payment. The one check was no. 287, dated May 21, 1975, and was paid to Jack Mitchell in the amount of $5. During 1974, Jonathan Cragg was paid *351 $807 for labor performed for D & H Custom Homes. Twelve of those checks were drawn on the D & H account. One was drawn on Hawthorne's personal account at the Farmers Bank of Windsor. During 1974, Walter Jones was paid $452.40 in seven checks drawn on the D & H account and was paid $352.01 in 1975 in another seven checks drawn on the D & H account. Robert Wallace was paid $85 in two checks drawn on the D & H account in 1974. Robert Robinson was paid $353.50 in six checks drawn on the D & H account in 1974 and 1975. James White was paid $100.25 in two checks drawn on the D & H account during 1974. Hawthorne contacted all five purchasers of the houses in Tucker's Subdivision in an effort to convince them to purchase a house. None of the purchasers ever dealt with Delano concerning the construction or purchase of their houses. Hawthorne advised, arranged for, and assisted in obtaining Farmers Home Administration (FHA) loans for all five purchasers. Hawthorne dealt with either Gladys Holland of the FHA or someone in her office concerning obtaining financing for the purchasers of houses in Tucker's Subdivision. Delano never dealt with the FHA. Hawthorne represented to the FHA *352 that he was the contractor who was building the houses in Tucker's Subdivision.Hawthorne's personally owned truck was used in the D & H construction operations. Hawthorne's personally owned trailer was used in the D & H construction operations and was located on the construction site. Because Delano lived in the Washington, D.C., area [4] throughout the construction period, he would sign a number of blank checks on the D & H Custom Homes account when he was in McKenney and leave them for Hawthorne to use. The D & H Custom Homes checking account listed Helen as a person having signature authority. In addition, Delano authorized Hawthorne to sign checks for him. Hawthorne determined what materials to buy, when to buy, and how much to pay for them. D & H Custom Homes check no. 483, in the amount of $4,300, dated April 9, 1976, was made payable to the Bank of Suffolk. The memo line on the check bears the catergorization "loan repayment." However, the check was deposited into Hawthorne and Delano's checking account at the Bank of Suffolk. D & H Custom *353 Homes check no. 484, in the amount of $5,000, date April 14, 1976, was made payable to the Farmers Bank of Windsor. The memo line on the check bears the categorization "loan repayment." However, the proceeds of the check were deposited into two separate accounts. Three thousand dollars was deposited into Hawthorne and Helen's joint checking account at the bank. Two thousand dollars was deposited into the trustee savings account for Travis Tucker. D & H Custom Homes check no. 485, in the amount of $10,000, dated April 14, 1976, was made payable to the Petersburg Mutual Savings & Loan. The memo line on the check bears the categorization "loan repayment." However, the check was deposited into a savings account in the names of Hawthorne, Helen, and Delano. During 1977, Allen E. Arbogast was a revenue agent with the Internal Revenue Service and was assigned to examine the joint income tax returns of Hawthorne and Helen for taxable years 1973 through 1975. Subsequently, the audit was expanded to include their 1976 return. Prior to Revenue Agent Arbogast's assignment to the investigation of Hawthorne and Helen's returns, tax auditors Marsha Buck and Carol Faulkner held interviews *354 with them on at least two separate occasions concerning excessive itemized deductions. [5] Specific documentation was requested for interest deductions, medical expense deductions, taxes, and charitable contributions. Included in the records provided by Hawthorne and Helen were real estate tax bills for the lots in Tucker's Subdivision. Those records indicated that the lots were numbered one through sixteen. During that time, Mr. Arbogast was the group manager of the two auditors. On January 6, 1977, Revenue Agent Arbogast interviewed Hawthorne and Helen at their home at two separate times during the day. Hawthorne told Revenue Agent Arbogast during the first interview that the land in Tucker's Subdivision was vacant, undeveloped land. Hawthorne also told Revenue Agent Arbogast that none of the land had been sold. After the first interview on January 6, 1977, Revenue Agent Arbogast checked the plat and deed records at the Dinwiddie *355 County Courthouse. He discovered a plat for Tucker's Subdivision containing 16 lots. Further, he verified that in Tucker's Subdivision, two pieces of property had been sold in 1974, two pieces of property had been sold in 1975, and that one piece of property had been sold in 1976. The deeds reflected that Hawthorne, Helen, and Delano had been the grantors on all five parcels. After checking the court records, and personally visiting Tucker's Subdivision where he observed that five houses had been built, Revenue Agent Arbogast interviewed Hawthorne and Helen again on January 6, 1977. Hawthorne again stated that he still owned all of the land in the subdivision and that none of it was developed. When Revenue Agent Arbogast informed Hawthorne of the results of his courthouse records check, and his visit to the subdivision itself, Hawthorne did not respond immediately. Then Hawthorne asked whether he had 18 months to reinvest the proceeds from a sale of a house. After Revenue Agent Arbogast informed him that the section 1034 reinvestment provision did not apply to income derived from a business, Hawthorne stated that the business belonged to Delano and that he was only involved *356 in the financing of the operation. [6] Hawthorne also told Revenue Agent Arbogast that Delano had helped support him and his wife during the past several years, giving them several thousand dollars. Special Agent George E. Shaheen was assigned to investigate the income tax liability of Hawthorne and Helen Tucker for taxable years 1974, 1975, and 1976. In addition, he was assigned to investigate the income tax liability of Delano Tucker for taxable years 1974, 1975, and 1976. On February 28, 1977, Hawthorne told Special Agent Shaheen that he had loaned money to Delano to set up D & H Custom Homes. Hawthorne stated that the funds came from money he had saved. He also told Special Agent Shaheen that because of his disability he was unable to do any physical work in the construction of the houses. He stated that he did some supervision but that he had taken no action whatsoever in the physical construction of the houses. Prior to purchasing a house in Tucker's Subdivision, Paulette *357 Moore lived one block from the subdivision. During 1974, she visited the construction site approximately once a day. She observed Hawthorne working at the construction site. Freddie C. Roberts observed Hawthorne building the frame of a house, putting up ceiling rafters, installing subflooring, installing floor joists, and installing plumbing and fixtures in the bathroom. Hawthorne told Kermit Powell that he built the kitchen cabinets for the houses in Tucker's Subdivision at his home in Suffolk, Virginia. He also observed Hawthorne installing some of the kitchen cabinets in the houses as well as working with electrical wiring and plumbing materials. Daniel Hopson also observed Hawthorne working with electrical wiring materials and plumbing materials. On occasion, Hawthorne assisted Mr. Hopson in the framing of the houses. Special Agent Shaheen interviewed Delano on February 2, 1978, and on May 11, 1978. During the May 11, 1978, interview, Delano was placed under oath and advised of the penalties of perjury. Thereafter, a sworn Question and Answer Statement was taken from him. During that interview, Delano told Special Agent Shaheen that in 1974 he had been told by a friend *358 from Norfolk, who was attending law school, that he had up to 18 months to report the income from D & H Custom Homes. When he was asked to identify the individual who gave him that information, Delano was only able to remember his name was "Cosmo T." Delano had no idea what his last name was, whether he was an attorney, or where he lived. "Cosmo T." was never located. During the May 11, 1978, interview, Delano admitted that he was the "dummy head" of D & H Custom Homes. He stated that the business was Hawthorne's and that Hawthorne ran the business. Delano stated that when D & H was first set up, he knew his father was receiving a disability pension from the State of Virginia. He and Hawthorne had discussed that Hawthorne could not report any income from constructing houses because he might lose his pension. Delano stated that although his father's pension was not large, if he lost it and D & H Custom Homes was unsuccessful, his father would have no income. As a result, it was decided that the business would be set up in Delano's name and that he would report whatever profits were made. Delano stated that after Revenue Agent Arbogast interviewed his parents concerning the audit *359 of their 1973 through 1975 income tax returns, Hawthorne told Delano that he had taken all of the D & H records to an accountant who would take care of reporting the income. Delano stated that he knew his father had turned the records over to the accountant on the premise that it was Delano's business and that the profits would be reported on Delano's return. O. W. Johnson, of the accounting firm of Robinson & Johnson, Norfolk, Virginia, prepared Delano's 1976 income tax return and his amended returns for 1974 and 1975. Hawthorne contacted Mr. Johnson and told him to prepare amended returns for taxable years 1974 and 1975 for Delano. Hawthorne told Mr. Johnson how to allocate the various expense items of D & H Custom Homes on the spread sheets and workpapers he developed in the preparation of Delano's returns. [7]
During the course of Special Agent Shaheen's investigation, James E. Goodwyn was contacted by Delano. Delano told Mr. Goodwyn that two special agents would be coming to see him.Further, Delano asked Mr. Goodwyn to tell the special agents that Delano had constructed the houses in Tucker's Subdivision. *360 James Goodwyn advised Special Agent Shaheen of Delano's telephone call and instructions. Hawthorne told Special Agent Shaheen that he did not have a mortgage on his home. On his joint income tax return for taxable year 1974, Hawthorne claimed a home mortgage interest expense deduction in the amount of $432. On his joint income tax return for taxable year 1975, Hawthorne claimed a home mortgage interest expense deduction in the amount of $745.78.Hawthorne told Special Agent Shaheen that the home mortgage interest expenses related to loans from the Bank of McKenney for D & H Custom Homes. Hawthorne told Special Agent Shaheen that with the exception of some rental income, he had reported all of his income on the joint income tax returns he filed for taxable years 1974, 1975, and 1976. On his joint income tax returns for 1974, 1975, and 1976, Hawthorne reported no interest income. During 1974, Hawthorne and Helen received $54.85 of interest income. During 1975, Hawthorne and Helen received $448.97 of interest income. During 1976, Hawthorne and Helen received $341.91 of interest income. Further, during 1976, an additional $380.52 of interest income was paid by the Petersburg Mutual *361 Savings and Loan and was not reported. During the period April 4, 1975, to January 16, 1978, Hawthorne had between $1,000 and $2,051.50 in his savings account at the Nansemond Credit Union. During the period April 3, 1975, to January 4, 1977, Hawthorne had between $2,320.39 and $5,320.39 in his joint savings account with his wife at the Bank of Suffolk. During the period April 14, 1976, to December 29, 1976, Hawthorne had between $10,000 and $10,380.52 in his joint savings account at the Petersburg Mutual Savings and Loan. During the period October 5, 1973, to December 30, 1977, there was between $110 and $2,416.63 in the trustee savings account Hawthorne maintained for his grandson at the Farmers Bank of Windsor. Beginning in 1973, Hawthorne maintained and/or made deposits to at least four checking accounts at the Bank of McKenney, the Farmers Bank of Windsor, and the Bank of Suffolk. On February 28, 1978, Hawthorne and Helen told Special Agent Shaheen that they had never received any inheritances or gifts. Hawthorne had an extensive personal history of borrowing money from financial institutions, as well as from other sources. During the period June 4, 1970, through January *362 18, 1978, Hawthorne received 27 loans from the Bank of Suffolk. The total principal amount of the those 27 loans was $55,050. Twenty-four of the loans were 90-day notes; one was a 93-day note; one was a 91-day note; and one was a 30-day note. In almost every instance, when a note became due, Hawthorne would borrow additional funds to pay off an existing note. Revenue Agent Lois Goodson was assigned to investigate the tax liability of Hawthorne and Helen for taxable years 1974, 1975, and 1976. In addition, she was assigned to investigate the tax liability of Delano for taxable years 1974, 1975, and 1976. During the course of her investigation, Revenue Agent Goodson requested O. W. Johnson and John M. Peterson, Esquires, to furnish affidavits from the individuals who received cash payments for subcontracting work. No such affidavits were provided. None of the individuals alleged to have been paid in cash was listed in the white pages or the yellow pages of the local telephone directories of mcKenney, Dinwiddie County, Petersburg, or the surrounding localities, by either name or occupation. Special Agent Shaheen, who was initially told that cash payments had been made to Andrew *363 Brown, Joe Cousin, John Miller, and Clayton Moore, checked the Dinwiddie County building inspector's records in an attempt to locate those individuals. None of them was listed as registered contractors with the Dinwiddie County building inspector's office. Hawthorne and Helen reported no income from the construction and sale of houses on the joint income tax returns they filed for taxable years 1974, 1975, and 1976. Delano reported no income from the construction and sale of houses on the original returns he filed for taxable years 1974 and 1975. [8] On his original return for taxable year 1976, Delano reported $1,382.16 of income from the sale of one house in 1976. In the notice of deficiency issued to Hawthorne and Helen Tucker on December 27, 1979, respondent determined that petitioners in docket No. 2433-80 understated their taxable income by failing to report the following net profits *364 received from Hawthorne's business of constructing and selling houses known as D & H Custom Homes: Amount of Unreported
Taxable Year
Net Profits
1974
$4,567.90
1975
13,322.84
1976
15,558.38
Respondent took a protective position and also determined in the notice of deficiency issued to Delano Tucker on the same date, December 27, 1979, that petitioner in docket No. 2434-80 failed to report the same net profits from D & H Custom Homes as follows: Amount of Unreported
Taxable Year
Net Profits
1974
$4,567.90
1975
13,322.84
1976
[9] 14,176.22
Respondent further determined that a part of the underpayments of income tax for both Hawthorne and Helen Tucker and Delano Tucker was due to fraud within the meaning of section 6653(b). [10] OPINION The issues presented for our consideration are: (1) whether petitioners Hawthorne and *365 Helen Tucker understated taxable income and corresponding income tax liability for taxable years 1974, 1975 and 1976 by failing to report as income net profits received from the business of constructing and selling houses known as D & H Custom Homes; and (2) whether a part of the underpayments of income tax due from Hawthorne and Helen Tucker for each of those 3 taxable years was due to fraud. If we decide that all or a portion of such net profits are not taxable to Hawthorne and Helen Tucker, then we must decide whether such amounts are taxable to Delano Tucker and, if so, whether any part of his underpayment of tax was due to fraud for the same 3 taxable years. Hawthorne and Helen Tucker - Income From D & H Custom Homes
The first issue for our decision is whether Hawthorne was in the business of constructing and selling homes and whether he is taxable on the net profits of such business for the taxable years in issue in the following amounts: 1974
$4,567.90
1975
13,322.84
1976
15,558.38
Petitioners Hawthorne and Helen Tucker argue that D & H Custom Homes was not Hawthorne's business but rather was a sole proprietorship belonging to their son, Delano. Respondent contends that D & H Custom *366 Homes was Hawthorne's business and that he is taxable on the net profits during 1974, 1975 and 1976. The burden of proof is on petitioners to show that respondent's determination is in error. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a), Tax Court Rules of Practice and Procedure.
The relevant facts are as follows: Delano lived in the Washington, D.C., area (approximately 150 miles from McKenney, Virginia) during the relevant period and attended George Washington University as a graduate student. In addition, during the fall semester of 1974 he worked 20 hours a week; during the spring semester of 1975 he worked 30 hours a week; and during the summer of 1975 he worked 40 hours a week. Beginning in September 1975, Delano was employed on a full-time basis by the Fairfax County School Board, Fairfax, Virginia, as a physical education teacher in a suburban school. Hawthorne retired from his position as an elementary school principal on a disability pension in July of 1971 and was not employed during the years 1974, 1975 and 1976. During the period June 18, 1974, through April 8, 1976, five houses were constructed by D & H Custom Homes in Tucker's Subdivision in McKenney, *367 Virginia, and sold for a total of $113,300. In 1974, two houses were sold for $22,500 each. In 1975, two more houses were sold, one for $22,800, and one for $23,000. In 1976, a fifth house was sold for $22,500. Hawthorne's participation in the building and selling of the five houses can be summarized as follows: Sometime prior to October 26, 1973, Hawthorne contacted W. G. Chappel, a certified public land surveyor, and requested that he prepare a survey and plat for an undeveloped parcel of land located in the Town of McKenney. The survey was made for the purpose of subdividing the land into 16 plots suitable for single family residences. The plat was drawn on October 26, 1973, and the subdivided land was named Tucker's Subdivision. On November 26, 1973, Hawthorne paid Mr. Chappel $1,275 for his services. Hawthorne contacted all five of the eventual purchasers of the houses in Tucker's Subdivision, explained the construction to them and shepherded them through the FHA financing process. He represented to the FHA that he was the contractor who would be building the houses. Hawthorne provided the necessary capital for the D & H Custom Homes project. During 1974 through 1975, *368 10 loans were obtained from the Bank of McKenney totaling $71,000. Hawthorne was personally liable on each loan. In addition, Hawthorne borrowed $2,000 from the Nansemond Credit Union, $5,000 from Wash's Inn, and $3,000 from Leroy Gathers. The total of $81,000 was used in the D & H Custom Homes business. Hawthorne determined what construction materials to buy, when to buy, and how much to pay for them. The two attorneys who handled the closings for the five houses, James F. Andrews and Herbert T. Williams, addressed all correspondence concerning legal matters to Hawthorne. The Disclosure/Settlement Statements prepared by Mr. Williams list H. I. Tucker or H. I. Tucker Construction Company as the seller. The checks representing the sale proceeds were made out to Hawthorne and were mailed to him. The funds received from the sales of the five houses in Tucker's Subdivision were deposited to either the D & H checking account at the Bank of McKenney or the personal joint checking account of Hawthorne and Helen at the Farmers Bank of Windsor. On December 11, 1974, $5,000 was deposited into Hawthorne and Helen's joint checking account at the Farmers Bank of Windsor. On March 3, 1975, *369 another $12,000 was deposited to that account. On April 3, 1975, $5,000 was deposited to Hawthorne and Helen's joint savings account at the Bank of Suffolk. On December 22, 1975, $2,000 was deposited to their joint checking account at the Farmers Bank of Windsor. On April 14, 1976, $3,000 was deposited to their joint checking account at the Farmers Bank of Windsor. Thus, at least a total of $27,000 of sales proceeds was transferred to the exclusive dominion and control of Hawthorne and Helen. The total net profits respondent determined for the 3-year period was $33,449.12. In addition, $2,000 was deposited in the trustee account of Travis Tucker on April 14, 1976, and has remained in that account. On April 14, 1976, $10,000 was deposited into a savings account at the Petersburg Mutual Savings and Loan and has remained in that account. While Delano as well as Hawthorne and Helen had signature authority over these two accounts, there is no evidence that Delano ever withdrew any amount for his own use. In fact, Delano admitted that he never received any profits from D & H Custom Homes. In contrast, Delano's participation in the business of D & H Custom Homes was minimal.He applied *370 for various state and local governmental licenses and permits in his and his mother's names and signed checks on the D & H Custom Homes checking account. However, he often signed blank checks for his father's use when he happened to be in McKenney and also admitted that he authorized Hawthorne to sign checks for him. Delano's knowledge of the business and what went on at the construction site is, at best, sketchy. We are thoroughly convinced from our review of the record that D & H Custom Homes was Hawthorne's business, that he received the proceeds, and that, accordingly, he is taxable on the income received from the sale of the five houses during the years in issue. Section 61(a) provides in relevant part that "gross income means all income from whatever source derived, including * * * (2) Gross income derived from business." It has long been established that income is taxable to him who earns it. Lucas v. Earl,281 U.S. 111 (1933). [11] Hawthorne was in control of the project from the very beginning.He held himself out as the owner of D & H Custom Homes, ran the business, earned the income, and therefore the net profits are taxable to him. Respondent's determination is sustained. *371 We must next consider the amount of net profits of D & H Custom Homes taxable to petitioners Hawthorne and Helen Tucker. Respondent computed the net profits in the notice of deficiency as follows: 1974
1975
1976
Gross Income [12] *372 $45,000.00 $45,800.00 $22,500.00 Cost of Goods Sold: Materials
22,688.93 18,498.54 1,736.10 Capitalized Items
2,953.22 2,953.22 1,476.61 Sub-contractors
6,766.20 662.56 1,000.00 Total Cost of Goods Sold
($32,408.35)
($22,114.32)
($ 4,212.71)
Total Profit
12,591.65 23,685.68 18,287.29 Deductions: Interest Expense
541.32 1,017.59 73.33 Legal Expense
756.92 44.00 Miscellaneous Expense
1,044.36 1,290.17 9.44 Wages
5,681.15 8,011.08 2,646.14 Total Deductions
$ 8,023.75 $10,362.84 $ 2,728.91 Net Profits
4,567.90 13,322.84 15,558.38 Previously reported
Adjustment
$ 4,567.90 $13,322.84 $15,558.38 Petitioners argue that respondent's calculation of the net profits of D & H Custom Homes is in error in that it does not take into consideration cash payments made to various subcontractors for work performed at the construction site in amounts totaling $3,980 in 1974, $5,019.36 in 1975, and $12,875 in 1976. Petitioners contend that the following individuals were paid in cash: Date
Payee
Amount
Work
10/17/74
Richard Blackwell
$ 1,987.00
Electrical & Heating
11/21/74
Thomas Johnson
1,993.00
Plumbing
3/5/75
Thomas Johnson
2,350.00
Plumbing
4/24/75
(Illegible)
269.36
Grading
9/17/75
Gary L. Brooks
2,400.00
Electrical & Heating
1/14/76
Andrew J. Brown
350.00
Insulation
1/15/76
Joe Cousins
8,500.00
Foundation & Framing
1/17/76
John Miller
1,875.00
Plumbing
1/28/76
Clayton Moore
2,150.00
Electrical
TOTAL
$21,874.36
In support of their position that cash payments totaling $21,874.36 were made petitioners introduced into evidence nine receipts claimed to have been written by the recipients at the time the cash was transferred. Delano testified at trial that the individuals who were given cash came from various places other than McKenney. He stated that "they were recommended by other *373 contractors or by word of mouth from people that just said that they knew somebody that would do the work." None of the eight individuals appeared at trial, Delano explained, as he was unable to locate any of them because he had no addresses. In addition, he stated that one of them, Richard Blackwell, was dead. Although Delano testified at trial that he had an affidavit from a funeral director to that effect, no such affidavit was ever produced. Delano further testified that all of the individuals were paid in cash because they refused to accept checks and that they agreed to do the work for less than what a regular contractor charged if they were paid in cash. Delano also stated that all of the cash payees were willing to wait until the house was sold before being paid. Delano testified that the cash payments were made shortly after the sale of a house because that was the only time enough cash was available to pay them. Respondent argues that the various inconsistencies and contradictions in Delano's testimony and the sworn question and answer interview of May 11, 1978, concerning the cash payments renders his entire story unworthy of belief. We must agree. The following *374 is illustrative of the many discrepancies. During the trial, Delano testified that he spoke to Richard Blackwell, Thomas Johnson, Gary L. Brooks, Clayton Moore, and Andrew Brown when they were at the construction site. With respect to Thomas Johnson, a man petitioners claim to have paid a total of $4,343 in cash for plumbing work, all Delano could state concerning the work he did was "I don't know. Someone who did work for us." With respect to Gary L. Brooks, a man petitioners claim to have paid $2,400 in cash for electrical and heating work, Delano's testimony is equally unenlightening. When asked who Mr. Brooks was, Delano responded "He probably - I think he was an electrician." At one point, Delano testified that he could not remember if he personally paid Mr. Brooks; shortly thereafter, however, Delano testified that he did pay him. Delano identified Andrew Brown as another person who worked on the construction but testified that he had not seen Brown's work. With respect to John Miller, Delano testified that he did not know him and that he did not know where he lived. Further, Delano stated that although the receipt (alleged to have been given by Miller at the time he was *375 paid) was made out to him, Delano had not paid Miller $1,875 in cash. During the sworn interview with Special Agent Shaheen, Delano claimed that John Miller was from Petersburg and that he had been recommended by someone Delano went to school with in Petersburg. At that time, however, Delano was unable to remember the name of the individual who had recommended Miller. Petitioners allege that a Clayton Moore was paid $2,150 in cash for electrical wiring. Delano testified at trial that Moore had been recommended to him by someone in Petersburg but that he did not know who recommended him. Delano stated that he handed Clayton Moore $2,150 in cash. During the May 11, 1978, interview, however, Delano told Special Agent Shaheen that he did not know who Clayton Moore was. When Special Agent Shaheen informed him he had an alleged cash receipt indicating that Moore had been paid $2,150, Delano stated "Ah, yes, it seems like I, I remember him [Hawthorne] telling me about having to pay the guy." At that time, Delano indicated that the funds to pay Moore would have come from the business accounts. At trial, petitioners alleged that he was paid with cash from a cash hoard maintained by *376 Hawthorne. Petitioners allege that a Joe Cousins was paid $8,500 in cash on January 15, 1976, for foundation and framing labor. At trial, Delano testified that he did not know Joe Cousins and that he did not know where he lived. When asked if he paid Joe Cousins the $8,500 in cash, Delano at first stated that he did and then that he did not. Delano testified that he thought he gave Hawthorne the cash to pay Cousins but then changed his mind and testified that Hawthorne had the cash, stating "because that was such a large sum, I didn't have it on hand, and I didn't have it in the checking account." During the May 11, 1978, interview, Delano had told Special Agent Shaheen that the $8,500 cash paid to Cousins would have come from the business bank accounts. Petitioners allege that a Richard Blackwell was paid $1,987 in cash on October 17, 1974, for electrical wiring and heating work. At first, Delano testified that he personally paid Blackwell the cash. When questioned whether Blackwell wrote the alleged cash receipt in Delano's presence at the time he gave him the cash, Delano stated he could not remember. Then Delano also changed his mind and stated that he did not remember if *377 he paid Blackwell the cash. Hawthorne's testimony in support of petitioners' argument that $21,874.36 in cash was paid for work performed at the construction site is, as respondent urges, even more unbelievable. Hawthorne testified that in most instances he gave the cash to Delano and that Delano gave the cash to the alleged contractors. After the Court instructed Hawthorne to answer respondent's question concerning the source of the alleged cash payments, he stated that the money came from a cash hoard he had accumulated during his working years. [13]
Hawthorne's alleged cash hoard is evidenced only by his evasive and self-serving testimony. Even his testimony with regard to the alleged cash hoard is vague and inconsistent. At first, he was unable to testify as to how much cash he had, stating that it was "quite a sizeable amount." Beyond stating that the cash was at home, Hawthorne refused to reveal where he kept it. When respondent *378 pressed Hawthorne as to what constituted a sizeable amount of cash, inquiring whether it was as much as $20,000, Hawthorne stated "I said to the investigator it could have been [$20,000.00] to $25,000.00. I think this is what I told him." During the Internal Revenue Service audit of Hawthorne's returns, Revenue Agent Arbogast interviewed him twice on January 6, 1977. At that point in time, Hawthorne was aware of the fact that the investigation not only concerned unreported income but also excessively large itemized deductions which had been claimed for the amount of income reported. [14] *379 Hawthorne never claimed that he had a cash hoard, or even alluded to the existence of one during the interview with Revenue Agent Arbogast. Rather, he told the agent that Delano had helped support him and his wife during the past several years and had given them several thousand dollars. It seems reasonable that if Hawthorne did in fact have a cash hoard, he would have disclosed its existence at that time, as well as his use of it, as a means of explaining his claimed deductions. Respondent contends that Hawthorne's further testimony concerning the alleged cash hoard is contradicted by the established facts and is inherently unbelievable. Again, we must agree. As an explanation of why he maintained a cash hoard, Hawthorne testified at trial that he did not trust banks entirely and that he did not put his money in the bank. However, the undisputed evidence shows that during the period April 4, 1975, through January 16, 1978, Hawthorne had between $1,000 and $2,051 in his savings account at the Nansemond Credit Union. Between April 3, 1975, and January 4, 1977, the balance in his joint savings account with his wife at the Bank of Suffolk ranged from $2,320.39 to $5,320.39. Between April 14, 1976, and December 29, 1976, Hawthorne had between $10,000 and $10,380.52 in his joint account at the Petersburg Mutual Savings and Loan. During the period October 5, 1973, through December 30, 1977, there was between $110 and $2,416.63 in the trustee savings account maintained for his grandson at the Farmers Bank of Windsor. *380 Further, beginning in 1973, Hawthorne maintained and made deposits to at least four checking accounts at the Bank of McKenney, the Farmers Bank of Windsor, and the Bank of Suffolk. Hawthorne testified that another reason he did not keep his money in the bank was that it would earn interest and then he would have to pay income taxes on the interest earned. However, during the years in issue, Hawthorne did earn interest on money he had in his savings accounts. [15]
At trial, Hawthorne also testified that he received inheritances from his wife's father, from a brother who lived in New York, and from another brother. However, he could not remember when he received the inheritances or how much he received. On February 28, 1975, Special Agent Shaheen interviewed Hawthorne and Helen and specifically asked them whether they had received any inheritances or gifts. He was told that they had never received any inheritances or gifts. We also note that Hawthorne has an extensive personal history of borrowing money from financial institutions, as well as from other sources. *381 During the period June 4, 1970, through January 18, 1978, he received 27 short-term loans from the Bank of Suffolk. The total principal amount of those loans was $55,050. Twenty-four of the loans were 90-day notes, one was a 93-day note, one was a 91-day note, and one was a 30-day note. In almost every instance, when a note became due, Hawthorne would borrow additional funds to pay off the existing note. We agree with respondent that it is incongruent that one with as sizeable a cash hoard as Hawthorne claims to have had would have such an extensive debt history. During the course of her investigation, Revenue Agent Lois Goodman requested O. W. Johnson and John M. Peterson, Esquires, to furnish affidavits from the individuals who received cash payments. Not a single affidavit was ever produced, nor was a single shred of other documentary evidence ever produced corroborating petitioners' testimony that cash payments were made. Revenue Agent Goodson and Special Agent Shaheen unsuccessfully attempted to locate the individuals whose names appear on the purported receipts. None of the individuals alleged to have been paid in cash was listed in the telephone directories of McKenney, *382 Dinwiddie County, Petersburg, or the surrounding localities, by either name or occupation. During the course of his investigation, Special Agent Shaheen was told that four cash payments had been made to Andrew Brown, Joe Cousins, John Miller, and Clayton Moore. He checked the Dinwiddie County building inspector's records in an attempt to locate those individuals. None of them were listed as registered contractors with the Dinwiddie County building inspector's office. In summary, we conclude that petitioners have utterly failed to prove error in respondent's computation of the net profits received by Hawthorne from D & H Custom Homes.The only error asserted by petitioners was respondent's refusal to consider the alleged cash payments.Certainly, if such subcontractor expenses were in fact incurred and paid, they would be deductible as ordinary and necessary business expenses under section 162. However, the parties stipulated only that the documents "purport to be receipts for cash payments." Petitioners failed to produce any competent or credible evidence that cash payments were made to the individuals from whom they purport to have received cash receipts. Accordingly, respondent's *383 determination of the computation of net profits for 1974, 1975, and 1976 must be sustained. Hawthorne and Helen Tucker -- Addition to Tax for Fraud
Respondent has determined that at least a part of the deficiency in income tax due from petitioners Hawthorne and Helen Tucker for each of the taxable years 1974, 1975, and 1976 was due to fraud. Section 6653(b) provides in pertinent part: If any part of any underpayment * * * of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 50 percent of the underpayment. * * * Unlike the presumption of correctness which generally attaches to determinations made in the notice of deficiency, Welch v. Helvering,supra;Rule 142(a), the burden of proving the applicability of the addition to tax for fraud is on respondent. Section 7454(a); Rule 142(b). In order to sustain this burden, respondent must affirmatively show, through clear and convincing evidence, that petitioner underpaid his taxes and that such underpayment resulted from an intentional wrongdoing designed to evade taxes believed to be owing. Estate of Pittard v. Commissioner,69 T.C. 391, 400 (1977); Stone v. Commissioner,56 T.C. 213, 220 (1971); *384 Beaver v. Commissioner,55 T.C. 85, 92 (1970). Although respondent need not show the precise amount of the underpayment which resulted from fraud, Plunkett v. Commissioner,465 F.2d 299, 303 (7th Cir. 1972), affg. a Memorandum Opinion of this Court, it must at least be shown by affirmative evidence that some fraudulent underpayment of tax in fact existed in order for respondent to prevail. Otsuki v. Commissioner,53 T.C. 96, 105 (1969). If respondent establishes that petitioners fraudulently underpaid their taxes in any amount, the section 6653(b) addition to tax attaches to the entire deficiency. Shaw v. Commissioner,27 T.C. 561, 570 (1956), affd. 252 F.2d 681 (6th Cir. 1958). The existence of fraud is a question of fact to be resolved upon consideration of the entire record. Gajewski v. Commissioner,67 T.C. 181, 199 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978). However, since direct evidence of fraudulent intent is seldom available, respondent may meet his burden of proof through circumstantial evidence derived from an examination of the taxpayer's entire course of conduct. [16]Brountas v. Commissioner,73 T.C. 491, 587 (1979), revd. on other grounds *385 692 F.2d 152 (1st Cir. 1982); Nicholas v. Commissioner,70 T.C. 1057, 1065 (1978); Stone v. Commissioner,supra at 223-224. After careful consideration of the record, specifically the affirmative evidence introduced by respondent, we conclude that respondent has proven by clear and convincing evidence that a part of the underpayment of income tax due from petitioners Hawthorne and Helen Tucker for each of the years 1974, 1975, and 1976 was due to fraud. We believe the evidence of fraud in this record is overwhelming. The following discussion of facts and circumstances is representative and forms the basis for our conclusion. While the mere understatement of income is insufficient to establish fraudulent intent, the consistent and substantial understatements of taxable income represents persuasive evidence of fraud. Cefalu v. Commissioner,276 F.2d 122, 129 (5th cir. 1960); Estate of Temple v. Commissioner,67 T.C. 143, 163 (1976); *386 Otsuki v. Commissioner,supra at 108. We have found that Hawthorne understated his taxable income for taxable years 1974, 1975, and 1976 in the amounts of $4,567.80, $13,322.84, and $15,558.38, respectively, by failing to report net profits Hawthorne received from D & H Custom Homes. It is clear from the evidence presented by respondent [17] *387 that for 3 consecutive years (i.e., the entire business existence of D & H Custom Homes), Hawthorne followed a consistent pattern of understating his taxable income by failing to report the net profits he received from the business. The evidence before the Court clearly presents a pattern of conduct that establishes Hawthorne's fraudulent intent. Hawthorne's consistent position at trial and on brief has been that the business of D & H Custom Homes belonged to Delano and that the net profits, if any, were taxable to him. However, the evidence amply demonstrates that Hawthorne knew from the inception of D & H Custom Homes that the business was his and that he income was taxable to him. By design, Delano was established as the "dummy head" of D & H. Hawthorne was receiving a disability pension from the State of Virginia, as well as disability retirement from the Social Security system.He believed that if the State of Virginia found out that he was receiving income from construction work, he would lose his pension. [18] *388 Hawthorne's conduct after contact by representatives of the Internal Revenue Service is further evidence of fraud. Throughout the course of the investigation of this case Hawthorne exhibited a chameleon-like ability to change his story repeatedly. On January 6, 1977, Revenue Agent Arbogast interviewed Hawthorne and Helen at their home on two occasions. During the day's first interview, when Hawthorne believed that the respondent was only concerned with excessive itemized deductions on his 1973 through 1975 returns, Hawthorne attempted to provide a logical source of the funds that would be needed to explain the amounts he claimed as deductions. He told the agent that during the past several years his son, Delano, had helped support him and his wife, giving them several thousand dollars a year. However, when the focus of he inquiry shifted to the land in Tucker's Subdivision, Hawthorne told the agent that all of the land was vacant and undeveloped and that none of it had been sold. Subsequent to that interview, Revenue Agent Arbogast checked the plat and deed records at the Dinwiddie County Courthouse. He discovered that five pieces of property *389 had been sold during the years 1974-1976. The deeds reflected that Hawthorne, Helen, and Delano had been the grantors on all five pieces of property. After checking the deed records, and personally visiting Tucker's Subdivision where he observed that five houses had been built, the agent interviewed Hawthorne and Helen again on January 6, 1977. During the second interview of the day, Revenue Agent Arbogast again asked if any land in Tucker's Subdivision had been developed or sold. In responding to that question, Hawthorne was again less than candid and stated that he still owned all of the land in the subdivision and that none of it had been sold. When confronted with the results of Agent Arbogast's records check and visit to the premises, Hawthorne inquired whether he had 18 months to reinvest the proceeds from a sale of a house. When he did not receive a favorable response, Hawthorne again changed his story and stated that the business of building the houses belonged to Delano. [19] *390 On February 28, 1978, Hawthorne told Special Agent Shaheen that because of his disability, he was unable to do any physical work in the construction of the houses. He further stated that he did some supervision but that he had absolutely not been involved in the physical construction. These statements are belied by the evidence introduced at trial. During direct examination, Hawthorne testified that his involvement in D & H was solely that of supervisor and financier. He further testified that he followed his doctor's orders to rest several hours each day while he was supervising at the construction site. However, Hawthorne was observed actively engaging in the construction of the five houses. He was seen erecting ceiling rafters and installing floor joists. In addition, he was seen installing plumbing fixtures in a bathroom and working with electrical wiring materials. Petitioners' story about Hawthorne's alleged cash hoard is further indicia of fraud.At numerous points during the investigation, petitioners had the opportunity as well as incentive *391 to reveal the existence of a cash hoard, had one really existed. The amount of the cash hoard was not mentioned until the trial. Even at trial, petitioners were vague about the details of their story, testifying only in very general terms about the size and sources of the alleged cash.At one point, Hawthorne testified that the cash came from savings he made during his working life. In addition, he testified that he had received inheritances from three sources. However, Hawthorne was unable to state the size of those inheritances. Further, Hawthorne and Helen had previously told Special Agent Shaheen that they had never received any inheritances or gifts. Finally, at trial Hawthorne testified that another of his reasons for maintaining a cash hoard was his philosophy not to deposit money in a bank because it would earn interest and then he would have to pay tax on the interest he earned. However, during each of the taxable years at issue, Hawthorne maintained savings accounts on which he earned interest and avoided paying tax on this interest income simply by failing to report any of it on his returns. Petitioners' misleading statements and conduct, as described above, occurring *392 both during and after the taxable years in question, are strong evidence that the returns filed by Hawthorne were fraudulent, with intent to evade tax. It is well settled that false and misleading statements made subsequent to the filing of the returns are evidence of fraud. E.g. Gromacki v. Commissioner,361 F.2d 727 (7th Cir. 1966). In conclusion, we find and hold that respondent has established by clear and convincing evidence that a part of the understatements of income tax due from Hawthorne and Helen Tucker during each of the taxable years 1974, 1975, and 1976 was due to fraud. Because we have concluded that D & H Custom Homes was Hawthorne Tucker's business and that he is taxable on he net proceeds of that business during 1974, 1975 and 1976 in the amounts determined by respondent, we need not consider respondent's alternative arguments that those same amounts are taxable to Delano and that a part of the underpayment of income tax due from Delano resulted from fraud. Appropriate adjustments in docket No. 2434-80 will be made in the Rule 155 computation. To reflect the foregoing, Decision in docket No. 2433-80 will entered for respondent.
Decision in docket No. 2434-80 *393 will be entered under Rule 155.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the taxable years in issue.↩
2. In the stipulation of facts, and at trial, petitioners Hawthorne and Helen Tucker and petitioner Delano Tucker conceded all of the adjustments in the statutory notices of deficiency except those concerning the net profits realized from D & H Custom Homes and the additions to tax pursuant to section 6653(b).↩
3. Prior to the time the houses in Tucker's Subdivision were constructed Hawthorne had constructed a house for his adopted daughter, Lois Craig. During the construction of her house (from October 2, 1973, through April 29, 1974), Hawthorne maintained a Building Account checking account at the Bank of McKenney, McKenney, Virginia. Delano did not participate in the construction of Lois Craig's house.↩
4. We take judicial notice of the fact that McKenney, Virginia, is approximately 150 miles from the Washington, D.C., metropolitan area.↩
5. On their 1974 return, Hawthorne and Helen reported adjusted gross income of $8,704.64 and itemized deductions of $7,582.25. On their 1975 return, Hawthorne and Helen reported adjusted gross income of $5,783.41 and itemized deductions of $6,025.64.↩
6. During the second interview on January 6, 1977, Helen Tucker did not answer any questions. The only remark she made was directed to hawthorne, stating "Go on, tell him" Hawthorne told her to be quiet.↩
7. O. W. Johnson never met with Delano, but did speak to him over the phone.↩
8. On Schedule C of his amended return for 1974, Delano reported a net loss from D & H Custom Homes of $309.41 and on his 1975 amended return Delano reported a net profit of $11,387.40. The amended returns were filed after respondent's investigation of Hawthorne and Helen Tucker's returns began.↩
9. This determination takes into consideration the net profit of $1,382.16 that Delano reported on his income tax return for 1976.↩
10. Respondent has conceded that if we sustain respondent's determination that all the net profits from D & H Custom Homes are taxable to Hawthorne, then those same profits are not taxable to Delano and the section 6653(b) addition to tax is not applicable to him.↩
11. We note that in this case, there is no assignment of income issue presented, see Lucas v. Earl,281 U.S. 111↩ (1930), as the facts show that no income was ever assigned to Delano but rather the proceeds from the sale of the houses were received by and remained under the control of Hawthorne. Thus, only the general rule of section 61 is involved.
12. The total gross income for the 3 years of $113,300 was derived from the sale of the five houses.
13. No explanation appears in the record as to why, as Delano testified, the subcontractors who were allegedly paid in cash had to wait for payment until the houses were sold if the source of funds for payments for their services was Hawthorne's cash hoard.↩
14. On his 1974 joint return, Hawthorne reported adjusted gross income of $8,704.64 and claimed itemized deductions totaling $7,582.25. On his 1975 joint return, Hawthorne reported adjusted gross income of $5,783.41 and claimed itemized deductions totaling $6,025.64.
15. However, we note that he avoided paying tax on this interest income simply by failing to report any of it on his returns.↩
16. We note that a taxpayer's failure to satisfy his burden of proof as to the deficiency determined by respondent does not constitute proof of fraud. Pigman v. Commissioner,31 T.C. 356, 370 (1958); Shaw v. Commissioner,27 T.C. 561 (1956), affd. 252 F.2d 681↩ (6th Cir. 1958).
17. See Pigman v. Commissioner,31 T.C. 356, 370 (1958).Petitioners make the curious statement on brief that "suffice it to say here that if respondent had any tax fraud case against petitioners, it would not have taken a 93 page brief to state that case." Petitioners' reply brief consists of an oratorical harangue directed at respondent for pursuing the Tuckers with such vigor for a deminimus deficiency. While it is true that the deficiencies in issue here are not astronomical, after a thorough consideration of the record which in our view evidences blatant tax fraud, we can understand respondent's persistence. Moreover, contrary to petitioners' assertion, it was not respondent who "obstinately insist[ed] that these asserted alternative tax deficiencies must be redetermined by this busy Court and at petitioner's expense."
18. Respondent points to this conscious decision to defraud these two Government agencies as negating any inference of a nonfraudulent intent to defraud a third Government agency. See McGee v. Commissioner,61 T.C. 249, 260 (1973), affd. 519 F.2d 1121↩ (5th Cir. 1975).
19. That Hawthorne was not being candid and straight-forward with Revenue Agent Arbogast is further evidenced by Helen's actions during the second interview of January 6, 1977. Although she never responded to any questions, at one point, she nudged Hawthorne and told him "Go on, tell him." Hawthorne told Helen to be quiet.